IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KLAMATH SISKIYOU WILDLANDS
CENTER, et al.,

                                   Civil No. 06-1604-CL

                                   **REPORT AND RECOMMENDATION**

                Plaintiffs,

                     v.

U.S. FOREST SERVICE,

                Defendant,

and

CLR TIMBER HOLDINGS INC.,
an Oregon Corporation, SOUTH COAST
LUMBER,  an Oregon Corporation, and
AMERICAN FOREST RESOURCE COUNCIL, an
Oregon Corporation.

                Defendant-Intervenors.

_____

**Clarke, Magistrate Judge:**

    Plaintiffs, Klamath Siskiyou Wildlands Center and Oregon

Wild ("Plaintiffs"), bring this action for declaratory and

injunctive relief against defendant United States Forest Service

("USFS") for failing to prepare a supplemental Environmental

Assessment ("EA") for the Low Meadow Timber Sale ("LMTS") on the

1 - REPORT AND RECOMMENDATION

Rogue River-Siskiyou National Forest in southwest Oregon, and for failing to comply with the survey and manage (S&M) requirements of the Northwest Forest Plan ("NWFP"). (Second Amended Complaint ¶ 1). Plaintiffs allege that the USFS is required by the National Environmental Policy Act, 42 U.S.C. §§ 4321 <u>et seq.</u> ("NEPA") to prepare a supplemental EA in response to significant new circumstances and information concerning the LMTS. (Id. at ¶ 2). Plaintiffs also allege that the USFS violated the National Forest Management Act, ("NFMA"), because the LMTS is not consistent with current S&M requirements. (Id.).

Plaintiffs seek: 1) a declaration that the USFS's failure to analyze and disclose the environmental effects of significant changed circumstances and new information relevant to the LMTS violates NEPA; 2) to have the court set aside the USFS's decision to proceed with the LMTS, because it violates NEPA; and 3) to have the court enjoin the USFS and its agents from proceeding with the LMTS, unless and until the USFS issues a new decision to proceed with the LMTS with appropriate new or supplemental NEPA analysis. (Id. at ¶ 4).

Before the court are Plaintiffs' motion for summary judgment (#58), Defendant's cross motion for summary judgment (#64), and Intervenor Defendants' cross motion for summary judgment (#67).

## **FACTS**

The Upper Chetco Meadow Restoration Project ("the Project"), which will be implemented through the LMTS, is designed to restore four meadow sites to pre-1940s condition. (AR at 735,

739-740, 764).  The purpose of the LMTS "is to restore meadow
habitat and hardwoods (primarily canyon live oak and madrone),
and to increase the amount of native grasses and improve wildlife
forage at High Prairie, Low Prairie, Mislatnah Prairies, and
Bronson Prairie.  (AR at 735).

The LMTS will recover 150 acres of meadow habitat and
wildlife forage, or one-third of the meadow habitat that is
currently found in the North Chetco Late Successional Reserve
("LSR").  (AR at 764, 1354).  The LMTS involves 118 acres of
clear cut and 32 acres of partial cut of large-tree forests.  (AR
741, 1535).  Douglas fir trees, madrone, and canyon live oak less
than 40 inches in diameter, as of 1996, that have encroached on
the meadows or are over-topping hardwoods will be harvested.  (AR
at 764).  The LMTS involves approximately 150 acres and
approximately 3.0 million board feet of timber.  (Id.).  In 1997,
the trees designated for cut were described as 60-80 years old
and were up to 40 inches in diameter.  (AR 740).

The Biological Evaluation ("BE") notes state that "habitat
is present in the project planning area " for Northern Spotted
Owl, del Norte Salamander, and Red-Legged Frog, among other
Forest Service sensitive species.  (AR 698, 700, 702-706, 712-
714, 732).  The project area does not contain, nor affect, any
area designated as critical habitat for the Northern Spotted Owl.
(AR at 1535).  There is no suitable habitat for the Northern
Spotted Owl within any of the proposed units.  (AR at 756).

Portions of the LMTS are in a LSR, Riparian Reserves, a Wild and Scenic Area, and lands designated as Back Country Recreation. (AR at 680, 738). Some of the units are within an Inventoried Roadless Area, but Units 1 and 2 are not within an Inventoried Roadless Area, and none of the units are adjacent to the Kalmiopsis Wilderness Area; the closest two units are 5 and 6, and are at least one mile from the edge of the Wilderness Area. (AR at 676, 681, 692). The area has two recreational hiking trails through the middle of the two logging units that lead into the Wilderness Area. (AR at 742).

In May 1996, the USFS completed the Upper Chetco 95 Timber Sale and Upper Chetco Meadow Restoration EA, which analyzed the Project under two alternatives. (AR at 668-696). A Decision Notice ("DN") was issued on July 13, 1996. (AR at 727). The USFS decided to proceed with the Project in July, 1996. (AR at 727).

After the EA was issued, it was determined that the acreage of meadow restoration and volume of timber for harvest differed from the description in the EA, and additional Project activities were proposed. (AR at 735). The USFS withdrew the advertisement of the timber sale until additional analyses could be completed. (AR 24 at 735). The USFS completed a supplemental EA on June 14, 1997, and issued a new Decision Notice/Finding of No Significant Impact on July 23, 1997 ("1997 DN/FONSI"). (AR at 734-762, 763-777).

As part of the NEPA process, the USFS completed a Biological Evaluation ("BE") for endangered, threatened, or sensitive species.  (AR at 697-718).  The BE found that the timber sale activities would not likely jeopardize habitat for all sensitive species.  (AR at 697-718, 1440-41).  A "may effect, not likely to adversely affect" determination was issued for the Northern Spotted Owl and Marbled Murrelet.  (Id.).  Seasonal restrictions were placed on Project activities.  (AR at 766, 706, 709).

As currently approved, the LMTS will harvest 140 acres of Douglas-fir and other coniferous species that have encroached on the meadows or are overtopping hardwoods.  (AR at 1354).  All canyon live oak and madrone, and Douglas-fir over 40 inches in diameter at breast height at the time of the LMTS award (1996) will be retained.  (AR at 766).  Other Project activities include: restoring meadow habitat riparian processes and functions; seeding native grasses; reducing slash in order to minimize the risk of a stand-replacement fire in the surrounding LSR; and removal of noxious weeds from High Prairie, "the Pines", and Roads 1376, 1376360, and 1376365.  (AR at 764-765, 768).

The USFS awarded the LMTS on September 23, 1997,  (AR at 778), and ground-disturbing activity was noted on March 18, 1998.  (AR at 917).  However, this contract expired by its own terms on December 31, 2001, and a new contract was awarded on March 28, 2005.  (AR at 784, 1352).  Further implementation has been delayed for many reasons including: the injunction issued in Pacific Coast Fed'n of Fishermen's Associations v. Nat'l Marine

Fisheries Serv. (PCFFA III), 71 F.Supp.2d 1063 (W. D. Wash.

1999), amending and superseding opinion at 253 F.3d 1137 , 265

F.3d 1028 (9th Cir. 2001), which became moot when the National

Marine Fisheries Service withdrew the twenty Biological Opinions

invalidated by the court (AR at 921, 1081, and 1442; the Biscuit

Fire, AR at 1327, 1349; market-related contract term adjustments,

see e.g., AR at 1523, 1528; and repairs to a bridge that provides

access to the LMTS area, AR at 1520, 1541 (Map showing

relationship of LMTS to Bridge Replacement Project).

The USFS conducted additional environmental assessments at

the Forest-wide level.  These environmental analyses include

subsequent Environmental Impact Statements ("EISs") on the

following issues: Biscuit Fire Assessment, AR at 1082-1304, 1307

(abstract only); assessment of Port-Orford-Cedar, AR at 1304

(cover page only), AR at 1305 (cover page only); and an analysis

for Preventing and Managing Invasive Species, AR at 1447-1511

(ROD).  The USFS issued two memoranda documenting the review of

potential new information and changed circumstances, and the USFS

determined that there was no significant information that

warranted supplemental NEPA analyses at the project-level.  (AR

at 1440-1444 ("2005 Memo"); AR at 1533-1539 ("2007 Memo")).

In 1994, the Forest Service and Bureau of Land Management

adopted a set of requirements known as the S&M mitigation

measures "for the management of habitat for late-successional and

old-growth forest related species."  (AR at 929).  Guidelines for

red tree vole ("RTV") surveys are located on page C-5 of the

NWFP.  (AR at 972).  On July 24, 2007, the Undersecretary of Agriculture signed the Record of Decision (ROD) to remove the S&M mitigation measures standards and guidelines from the Forest Service Land and Resource Management Plans within the Range of the Northen Spotted Owl.  72 Fed. Reg. 41288-89 (July 27, 2007).

During the past ten years, there has been new scientific information developed regarding threats to the Northern Spotted Owl from West Nile Virus, Barred Owls, and Sudden Oak Disease. (AR at 1320, 1446).  Specifically, two reports have been issued since the Project's EA and supplemental EA: the September 2005 Northwest Forest Plan Status Report on the Spotted Owl ("The 2005 Report")(AR at 1446) and the September 2004 Scientific Evaluation of the Status of the Northern Spotted Owl ("The 2004 Report")(AR at 1320).

The 2004 Report discusses the biology and ecology of the West Nile Virus, a mosquito-borne virus, noting that it first appeared in the United States in New York City in 1999, and has since spread across North America.  (The 2004 Report at 8-30-8-31).  The 2004 Report states that transmission depends upon numerous factors.  (Id. at 8-31).  At the time of the report, West Nile Virus had not emerged in Oregon, except for isolated cases.  (Id.).

West Nile Virus infects spotted owls through mosquitos and infected prey.  (Id. at 8-32).  The report found that West Nile Virus was a threat to the spotted owl, but that its potential to reduce the owl population was unclear, and that such potential

depended on several factors. (Id. at 8-34).

The 2004 Report addressed the potential impacts of Sudden Oak Death on the spotted owl. (Id. at 6-26-6-28). The report found that the disease had the potential to be locally important in some parts of the owl's range and that it infected many important trees species. (Id. at 6-26). The report found that the current effect of the disease and its possible duration were unknown. (Id.).

Modifications of spotted owl habitat would be in several forms, but altered forest structure was most probable in the Klamath-Siskiyou region. (Id.). The report found that "if other evergreen hardwood species, such as Pacific madrone, Canyon live oak, and golden chinkapin, ultimately suffer significant mortality from SOD, the potential impacts of SOD could be large in terms of acreage of Northern Spotted Owl habitat affected." (Id. at 6-27). The report concluded that there were many uncertainties surrounding the eventual impact of sudden oak death on Northern Spotted Owl habitat. (Id. at 6-28).

The 2004 Report devotes a chapter to assessing the potential threat of the barred owl to the spotted owl. (Id. at Chapter 7). The FWS identified the barred owl as a potential threat to the spotted owl at the time the spotted owl was listed as threatened in 1990. (Id. at 7-3). This chapter states that the factors which permit the barred owl to expand its range are unknown, and that it is unclear whether it is a natural occurrence or human influenced. (Id. at 7-13).

The barred owl now occupies a range that is roughly coincident with the spotted owl.  (Id.).  Barred owls use the same habitat as spotted owls, and, in addition, use habitats not used by spotted owls.  (Id. at 7-19).

They are very few barred owls in early successional forests in areas from the coastal Redwoods to the Sierra Nevada.  (Id. at 7-13-7-14).  Barred owls occupy old-growth and mature conifer forests.  (Id.; 7-23).  The barred owl has invaded and the spotted owl has declined in areas that have never been subject to timber harvest.  (Id. at 7-29).  The areas where the spotted owls are in the worst decline have never been harvested.  (Id. at 7-31).

It is unclear what impact timber harvesting has on the spread of the barred owl, and "results suggest something other than timber harvest is influencing occupancy in [certain locations]".  (Id. at 7-34).  It is unclear how forest management affects the interaction of the two species.  (Id.).  In some portions of the spotted owls' range, barred owls are increasing and spotted owls are declining independent of the forest management history in the area.  (Id. at 7-35).  It is unclear why the barred owl has not moved into certain areas in larger numbers.  (Id. at 7-38).

In the 2005 Memo, the USFS considered the 2004 Report.  (AR at 1443).  The USFS determined that: "None of the new information provided by these studies would change the effects determinations for this project."  (Id.).  The USFS considered a 1996 BE which

found that the Project was not likely to adversely affect the spotted owl. (AR at 1440, 1441). The USFS also noted that mandatory restriction were placed upon activities within 1/4 mile of any nest site or activity center. (Id. at 1441). The USFS concluded that there was no need to supplement or revise the underlying NEPA analysis. (AR. 1443-1444).

The 2005 Report also contains information on the barred owl and West Nile Virus. (2005 Report at 89,96,101). The report points out that there is "uncertainty about the barred owl's pattern of range expansion, interactions with the spotted owls . . ., and the contribution of barred owls to the decline of spotted owls . . .". (Id. at 89). The barred owl's range now overlaps most of the spotted owl's range. (Id.). One report determined that "barred owl sites surpassed the number of occupied spotted owl sites in late-successional reserves in southwest Washington." (Id. at 91). The 2005 Report found that the survival of spotted owls depended upon biological and physical factors. (Id. at 95).

One study found that spotted owl survival increased with increasing amounts of spotted owl habitat and increasing the edge between spotted owl habitat and other habitats. (Id. at 95). Another study found that increases in late-seral forest had a positive effect on spotted owl survival. (Id. at 96). The 2005 report concluded that spotted owl survival and productivity depended upon a number of factors including climate and habitat. (Id. at 98).

10 - REPORT AND RECOMMENDATION

The report also found that:

There are many ideas as to the cause of the barred owl
invasion ranging from climate change to forest
management practices. However, there are no data to
support or refute any of these hypotheses (Kelly et al.
2003) it is unclear if forest management has an effect
on the outcome of interactions between barred and
spotted owls (Courtney et al. 2004). It is known that
barred owls appear to be habitat generalists that can
occupy a broad range of forest conditions (Courtney et
al. 2004).

(Id. at 101).

The 2005 Report contains the following information on West

Nile Virus:

The West Nile virus is a threat to the spotted owl
because it has the potential to reduce population
numbers beyond the projected decline under the Plan.
The magnitude of the potential effect is unknown. So
far, no mortality in wild northern spotted owls has
been recorded, but the first cases of the virus in
other species were only recently recorded in the range
of the spotted owl.

(Id.)

In the 2007 Memo, the USFS had an interdisciplinary team

evaluate the new information and changed circumstances as they

related to the LMTS. (Tr. 1533). The team re-reviewed the 2004

Report and noted that the report states that the threat to owl

populations from habitat loss and fragmentation due to timber

harvest has been greatly reduced due to timber harvest reductions

on federal land. (Id.). The team also re-reviewed the 2005

Report and found that there was no information of significance to

the effects of the LMTS. (Tr. 1534). The USFS determined that

the LMTS consequences "have no measurable direct or indirect

influences on occurrences of catastrophic wildfire, barred owls,

or West Nile Virus, since habitat condition variables were not listed as causative factors concerning barred owls or West Nile virus . . .". (Id.). The USFS found no reason to change the LMTS based upon the 2004 or 2005 Reports. (Id.).

The USFS addressed sudden oak death disease, and reported that current infection rates in southern Oregon were low, because of an aggressive search and destroy strategy. (Tr. 1535). The 2007 Memo stated that there was no sudden oak death in the LMTS area. (Id.). The 2007 Memo found that information on sudden oak death disease was not significant to the LMTS. (Id.). The USFS concluded that the information presented on West Nile Virus, the barred owl, and Sudden Oak Death did not concern the environmental effects of the LMTS and did not warrant supplemental NEPA documentation. (Tr. 1538).

In 2002, the Biscuit Fire occurred. (Biscuit Fire Recovery Project Final EIS at III -1). It destroyed 68,000 acres of late-successional/nesting-roosting habitat. (Id. at 170). In the North Chetco LSR, the fire destroyed 11% of the nesting/roosting habitat. (Id. at Appendix E at 18 Table 4b). Forest-wide, 17% of the suitable nesting/roosting habitat was lost. (Id.).

In response to the fire, the USFS and the Bureau of Land Management completed a Final EIS on the Biscuit Fire Recovery Project ("Biscuit Fire Final EIS"). (AR at 1307). The Biscuit Fire Final EIS studied the cumulative effects of the Biscuit Fire in combination with a number of completed, ongoing, and foreseeable future projects, including the LMTS, on: wildlife and

12 - REPORT AND RECOMMENDATION

wildlife habitat, including that of the Northern Spotted Owl and
the RTV (Id. at 11-12, 17, 152-198, Appendix E at 1-9, 11-21, 25-
26); the Port Orford Cedar and root rot disease (Id. at 145-151);
Recreation and Wilderness, including Inventoried Roadless Areas,
Backcountry Recreation Areas, and the trail system (Id. at 7,
293-427 and Appendix H); and the spread of noxious weeds (Id. at
122, 124-130, 140 and Appendix K).

In July of 2004, the USFS sent out a team, which included a
wildlife biologist, to examine the Project site after the Biscuit
Fire. (AR at 1314-1315). They drove to the Tin Cup Trailhead
and found that noxious weeds were still present at the trailhead.
(Tr. 1314). They observed that the fire did not burn through
Units 3, 4, 5, and 6. Noxious weeds were present along the Tin
Cup Trail from Unit 3 (Lower Mislatnah Prairie) and the junction
of Trail 1119 all the way to and throughout Unit 6, which were
not present in the area prior to the fire. (Id.).

The Biscuit Fire burned with low to medium intensity in Unit
6, and there were no apparent dead standing trees from the fire.
(Id.). The boundary along the west side of Unit 6 was adjusted
approximately 50 feet east of the posted boundary in order to
remove riparian area from the unit. (Id.). They did not find
that any other changes needed to be made to the original
prescription in the EA. (Id.).

In Unit 3 and 4, they found riparian areas and found that
on-site potential tree buffers would be needed in both units.
(Id.). They also flagged "One side channel in Unit 3 at the

13 - REPORT AND RECOMMENDATION

second switchback in trail".  (Id.).

In Unit 1, they found that the area was in need of one-site potential tree buffer, which would take out 2-3 acres along the east part of the unit and a small 2-3 acre part of the unit south of the riparian buffer along the dozer line.  (Id.).  The Biscuit Fire did not burn the area.  (Id.).

A dozer line continued down the ridge to Unit 2 - Low Prairie.  (Id.).  They found a fire shelter deployment located half way between Units 1 and 2.  (Id.).  They found that the lower part of Unit 2 boundary "appears to have missed encroachment area and may be extended approximately 100 feet south of the current boundary for entire southern boundary portion . . .".  (Id.).  They found noxious weeds growing in the dozer line.  (Id.).  It was suggested that an additional area "between top unit boundary and ridge with dozer line could be added to unit - appears to be encroachment area as well."  (Id. at 1315).

The field notes contain the following conclusions:

Biscuit Fire appeared not to have killed commercial size trees in Units 3-6.  Small patches of encroachment (less than 4" dbh) did burn with higher intensity. Tansey and thistle prevalent throughout area where grasses previously occupied units.

Riparian buffers needed in one area of Unit 1, two areas of unit 3 and 4, and one area of Unit 6. Treatment of these riparian areas to restore meadow habitat preferred but not mandatory.

Adjustment to KV plan: Treatment for noxious weeds needed to be re-calculated for sale area: costs, amount of acres treated, and re-seeding to re-establish native grasses.

14 - REPORT AND RECOMMENDATION

> Project still a No Effect for TES.
> Beneficial effects for deer and elk and neotropical
> migratory birds.
> Snag and down wood habitat guidelines would remain as
> described in the EA - not changed due to Biscuit Fire.
>
> Concern: dozer line from road 1376 to Low Prairie -
> needs additional rehabilitation to remove berms.  one
> area of erosion noted.  Need to discourage ATV use of
> this line; need to make sure vehicle access off road
> 1376 does not occur.  Shelter deployment area could be
> seeded with native seed to establish forage in area -
> currently bare.
>
> Also, dozer line area could be thinned to provide fuel
> management zone down this ridge.  The area [contains]
> small patches of Douglas fir that could be removed
> (less than 20" dbh) and still retain 40 percent canopy
> closure within the Late-Successional Reserve.

(Id.).

The 2005 Memo noted that since the Biscuit Fire, additional

efforts for weed control have become necessary as "much of the

sale area has been invaded by noxious weeds".  (AR at 1442).  The

USFS planned to adjust the KV plan for the project to make

noxious weeds a high priority for treatment.  (Id.).  The USFS

concluded that no additional NEPA analysis was necessary.  (Id.

at 1444).

The USFS also issued a ROD for an Invasive Plant Program to

prevent and manage invasive plants.  (AR at 1447).  The USFS

conducted a review of noxious weeds at the Project site as noted

in the above field notes.  (AR at 1531).

In the 2007 Memo, the USFS documented the review of new

information by an interdisciplinary team.  (Id. at 1533).  The

USFS again examined the ROD for Preventing and Managing Invasive

Plants.  (Tr. 1537).  The USFS included contract provisions to

treat noxious weeds and also included funding for treatments. (Id.).  The USFS concluded that these measures effectively addressed the potential spread of noxious weeds, and no additional proposals or analysis was needed.  (Id.).

Since the original EA and supplemental EA were issued, the USFS has done several reports concerning the spread of Port Orford Root Rot Disease.  (AR at 1304-1306).  The USFS reviewed this information to determine that the LMTS contract was consistent with the 2004 ROD, and includes the standard mitigation measures.  (AR at 1443, 1537).  The USFS determined that the information was not new or significant to warrant supplemental NEPA documentation.  (Id. at 1444, 1537).

## **LEGAL STANDARDS**

A federal agency must prepare an supplemental EIS when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1)(ii).  In deciding whether to supplement an EIS, the agency "should apply a 'rule of reason[.]'"  Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 373 (1989).  An "agency need not supplement an EIS every time new information comes to light after the EIS is finalized.  To require otherwise would render agency decision-making intractable, always awaiting updated information only to find the new information outdated by the time a decision is made."  Id. (footnote omitted).  "On the other hand . . . NEPA does require that agencies take a 'hard look' at the

16 - REPORT AND RECOMMENDATION

environmental effects of their planned action, even after a
proposal has received initial approval."  Id.

"Application of the 'rule of reason' thus turns on the value
of the new information to the still pending decisionmaking
process."  Id.  "If there remains 'major Federal actio[n]' to
occur, and if the new information is sufficient to show that the
remaining action will 'affec[t] the quality of the human
environment' in a significant manner or to a significant extent
not already considered, a supplemental EIS must be prepared."
Id. (footnote and citations omitted).

An agency's decision not to prepare a supplemental EIS must
be affirmed unless that decision was "arbitrary or capricious."
Id. at 377.  Review under this standard is narrow and the
reviewing court may not substitute its judgment for that of the
agency.  See League of Wilderness Defenders-Blue Mountain
Biodiversity Project v. Bosworth, 383 F. Supp. 2d 1285, 1292 (D.
Or. 2005).

In deciding whether an agency decision was arbitrary or
capricious, the reviewing court must evaluate whether the agency
has considered all of the relevant factors, or has entirely
failed to consider an important aspect of the problem or relied
on factors that Congress has not intended the agency to consider.
Id. at 1292-93.  The reviewing court must also evaluate whether
the agency has articulated a rational connection between the
facts found, the governing law, and the conclusions reached, or
if the agency has offered an explanation for its decision that

17 - REPORT AND RECOMMENDATION

runs counter to the evidence before the agency or is so
implausible that it could not be ascribed to a difference in view
or the product of the agency's expertise.  Id.  "Thus, the
inquiry, though narrow, must be searching and careful."  Id. at
1293, citing Ninilchik Traditional Council v. United States, 227
F.3d 1186, 1194 (9th Cir. 2000).

## DISCUSSION

Plaintiffs allege that in the last nine years the following
circumstances have changed and new information has been uncovered
that requires a supplemental EA:

a. In September 2004, the Sustainable Ecosystem Institute
prepared the Scientific Evaluation of the Status of the Northern
Spotted Owl as part of the status review process required by the
Endangered Species Act;

b. In September 2005, the U.S. Fish and Wildlife Service prepared
the Northwest Forest Plan Status Report on the Spotted Owl as
part of the status review process required by the Endangered
Species Act;

c. In 2002, the Biscuit Fire burned through the Low Meadow
planning area and proposed harvest units;

d. Due to the Biscuit Fire, the Low Meadow planning area has been
invaded by invasive species;

e. In 2005, the Forest Service changed the proposed action,
including noxious weed control, changes to the "no cut" buffers,
and other changes;

f. In 2004, the Forest Service developed new requirements

18 - REPORT AND RECOMMENDATION

regarding practices to manage the spread of Port Orford Cedar root disease;

g. In 2001, the Forest Service adopted new requirements for survey and manage species;

h. In 2006, the Ninth Circuit reinstated the 2001 requirements to survey and manage for the red tree vole;

i. In 2006, the U.S. District Court for the Western District of Washington reinstated the survey and manage requirements for all species protected by the program as of March 22, 2004;

j. The legal standard regarding the purpose and role of spotted owl critical habitat, including the validity of the regulatory definition of "destruction or adverse modification" of critical habitat, has changed;

k. In 2000, the Clinton Administration implemented the Roadless Area Conservation Rule (2000 Roadless Rule), which prohibited timber harvesting in inventoried roadless areas;

l. In 2001, the Bush Administration rescinded the 2000 Roadless Rule, and instated a new rule (2001 Roadless Rule) that would not have protected roadless areas in the same manner as the 2000 Rule;

m. In 2006, the District Court of the Northern District of California invalidated the 2001 Roadless Rule and reinstated the 2000 Roadless Rule;

n. The Bureau of Land Management is currently engaging in the Western Oregon Plan Revision (WOPR) process. The BLM is considering several alternatives that would eliminate Late-

19 - REPORT AND RECOMMENDATION

Successional Reserves (LSRs) from BLM land in western Oregon, increasing the importance of LSRs on National Forest lands;

o. The United States Fish and Wildlife Service is currently revising the critical habitat designation for the northern spotted owl, and is drafting a recovery plan for the owl; and

p. In the ten years since the Forest Service initially decided to proceed with the LMTS, it is likely that other actions have occurred within the area that would contribute to the cumulative effects of the proposed LMTS. (Id. at ¶ 33).

**Abandoned Claims**

Plaintiffs have addressed only nine of fifteen events alleged in their complaint as new and significant circumstances in their brief in support of summary judgment. In addition, plaintiffs have failed to support their claims regarding Port Orford root rot disease. To the extent that plaintiffs failed to present any arguments or evidence to support claims f, j, k, l, m, n, and o, the court deems them abandoned, and defendants are entitled to summary judgment on these claims. American Lands Alliance v. Kenops, 1999 WL 672213 at *2 (D.Or.); Self Directed Placement Corp. v. Control Data Corp., 908 F.2d 462, 466-467 (9th Cir. 1990).

**S&M Requirements - Mootness**

Defendants claim that plaintiffs' claims regarding the RTV and the S&M requirements are moot.

The defendant has a heavy burden to demonstrate mootness. Los Angeles County v. Davis, 440 U.S. 625 (1979). An action is

20 - REPORT AND RECOMMENDATION

moot where the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome. Northwest Environmental Defense Center v. Gordon, 849 F.2d 1241, 1244 (9th Cir. 1988)(quotation and citations omitted). "The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted." Id. (citation omitted). As long as effective relief may still be available, the controversy remains live and present. Id. at 1245. The court does not have jurisdiction over a claim to which no relief can be granted. Headwaters, Inc. v. Bureau of Land Management, Medford Dist., 893 F.2d 1012, 1015 (9th Cir. 1990)(citation omitted).

The undisputed facts demonstrate that on July 24, 2007, the Undersecretary of Agriculture signed the Record of Decision (ROD) to remove the S&M mitigation measures standards and guidelines from the Forest Service Land and Resource Management Plans within the Range of the Northen Spotted Owl. 72 Fed. Reg. 41288-89 (July 27, 2007). The S&M requirements form the basis of plaintiffs' NFMA claim and their claim regarding failure to survey for RTVs. Therefore, the court finds that these claims are moot, because the court cannot grant plaintiffs any effective relief. See Colorado Off Highway Vehicle Coalition v. U.S. Forest Service, 357 F.3d 1130, 1133-1134 (10th Cir. 2004)(claim based upon failure to comply with provisions of Forest Plan rendered moot by issuance of new Forest Plan); See also Utah Animal Rights Coalition v. Salt Lake City Corp., 371 F.3d 1248, 1256-1257 (10th

Cir. 2004)(facial challenge to ordinance rendered moot when amendment to ordinance cured defect); See also Foster v. Carson, 347 F.3d 742, 746 (9th Cir. 2003)(claim challenging state budget reduction plan moot when plan expired); See also Gulf of Maine Fishermen's Alliance v. Daley, 292 F.3d 84, 88 (1st Cir. 2002)(claim based on regulations moot with the promulgation of new regulations); See  also Wilderness Society v. Tyrrel, 918 F.2d 813, 818 (court would not require federal agency to prepare management plan for rivers designated under Wild and Scenic Rivers Act before conducting management activities on adjacent lands when such requirement was not contained in the statute). Defendants' are entitled to summary judgment on plaintiffs' claims regarding the RTV.

**West Nile Virus/Sudden Oak Death Disease/Barred Owl**

NEPA requires the disclosure of direct and indirect effects of an agency action.  40 C.F.R. § 1508.8.  Direct effects are the immediate effects caused by the action.  Id.  Indirect effects are future effects caused by the action which are reasonably foreseeable.  Id.

NEPA also requires an agency to analyze any cumulative impacts resulting from the proposed action.  Northwest Environmental Defense Center v. Bonneville Power Administration, 117 F.3d 1520, 1536 (9th Cir. 1997).  Cumulative impacts are defined as:

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future

actions regardless of what agency (Federal or non-federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. §1508.7.

Under NEPA, an agency need not address matters which are not "effects" of the agency's action.  <u>Department of Transportation v. Public Citizen</u>, 541 U.S. 752, 764.  An agency is only required to address an effect if there is "a reasonably close causal relationship between the environmental effect" and the agency action.  <u>Id</u>. at 767-768.  NEPA's disclosure requirements serve two purposes: 1) to "ensure that the agency in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts [of the proposed action]" and 2) "that the relevant information will be made available to the larger audience that they may also play a role in both the decision-making process and the implementation of that decision." <u>Id</u>. at 768-770.  Where an agency lacks the ability or the authority to control or prevent an effect, these two purposes are not served and the agency does not have to address that effect under NEPA.  <u>Id</u>. at 766-770.

In this case, the USFS took a hard look at the effects of West Nile Virus, Sudden Oak Death, and the barred owl on the spotted owl.  The USFS reasonably concluded that these impacts had no relationship to the LMTS.  The USFS's conclusions are supported by the record.  The record demonstrates that there is no causal connection between West Nile virus, barred owls, and

Sudden Oak death and the LMTS.  The court rules that the USFS's determination was not arbitrary and capricious.

**Effects of the Biscuit Fire**

Plaintiffs contend that the USFS must Prepare a supplemental EA to study the cumulative impacts of the Biscuit Fire and the LMTS on: 1) wildlife species such as the spotted, owl, RTV, and hermit warblers and the related habitat loss; 2) the spread of noxious weeds; and 3) the effects on backcountry hiking trails. Defendants contend that the USFS considered these cumulative impacts: 1) in the Biscuit Fire Final EIS; 2) by sending out a team to evaluate the effects of the Biscuit Fire in the Project area, and 3) by having an interdisciplinary team evaluate all new information, and that the USFS properly concluded that a supplemental EA was not necessary.

The USFS completed a Final EIS on the Biscuit Fire Recovery Project.  (AR at 1307).  The Biscuit Fire Final EIS studied the cumulative effects of the Biscuit Fire in combination with a number of completed, ongoing, and foreseeable future projects, including the LMTS, on: wildlife and wildlife habitat, including that of the Northern Spotted Owl and the RTV (Id. at 11-12, 17, 152-198, Appendix E at 1-9, 11-21, 25-26); the Port Orford Cedar and root rot disease (Id. at 145-151); Recreation and Wilderness, including Inventoried Roadless Areas, Backcountry Recreation Areas, and the trail system (Id. at 7, 293-427 and Appendix H); and the spread of noxious weeds (Id. at 122, 124-130, 140 and Appendix K).  In July of 2004, the USFS sent out a team, which

24 - REPORT AND RECOMMENDATION

included a wildlife biologist, to examine the Project site after the Biscuit Fire. (AR at 1314-1315).

In 2005, the USFS prepared a memo, The 2005 Memo, which reviewed new information regarding the spotted owl, including the 2004 and 2005 Reports, other wildlife covered by a 1996 BiOp, the EIS on the Port Orford Cedar, and discussed the need to adjust the KV plan for the project to make noxious weeds a high priority for treatment. (Id. at 1442). The USFS concluded that no additional NEPA analysis was necessary. (Id. at 1444).

In the 2007 Memo, the USFS had an interdisciplinary team evaluate the new information and changed circumstances as they related to the LMTS. (AR at 1533). The team: re-reviewed the 2004 and 2005 Reports on the spotted owl; reviewed the US Fish and Wildlife Service's Draft Recovery Plan for the spotted owl; reviewed the effects of the Biscuit Fire and the Biscuit Fire Final EIS; reviewed information on the Port Orford Cedar; reviewed information on Inventoried Roadless Areas; considered the BLM's revising its Western Oregon Plan; reviewed information on Preventing and Managing Invasive Plants; and reviewed information on the Aquatic Conservation Strategy. (AR at 1533-1538). Throughout the 2007 Memo, the USFS gives reasoned explanations as to why the new information does not trigger the need for supplemental NEPA analysis. (Id.).

If an environmental impact is considered in a programmatic or regional EIS, then that impact does not have to be re-examined in a site-specific EIS. See Headwaters v. BLM, 914 F.2d 1174,

1178 (9th Cir. 1990), rehearing denied, 940 F.2d 435 (9th Cir. 1991). However, to allow tiering to a programmatic or regional EIS, that EIS must account for specific impacts of the proposed project and contain details concerning the proposed project and its impacts. See Muckleshoot Indian Tribe v. USFS, 177 F.3d 800, 810 (9th Cir. 1999). The proposed project needs to be concrete enough to allow for adequate analysis. Id.

In this case, the cumulative effects of the Biscuit Fire and the LMTS on wildlife, including the spotted owl, RTV, and other late-successional dependent species, Recreational Trails, and noxious weeds were studied in the Biscuit Fire Final EIS. The LMTS EA and supplemental EA were in existence at the time the Biscuit Fire Final EIS was complete. The USFS does not have to do another cumulative impacts analysis of the cumulative effects of the Biscuit Fire and the LMTS as they have already been addressed in the Biscuit Fire Final EIS.

The USFS fulfilled its obligation to take a hard look at the impacts of the Biscuit Fire in combination with the LMTS by relying upon the Biscuit Fire Final EIS, the field notes of the USFS team that examined the Project Area after the fire, and the interdisciplinary teams assessment of new information. The USFS gave a reasoned explanation as to why further NEPA supplementation was not required. The USFS's decision not to do further NEPA analysis on the effects of the LMTS in combination with the Biscuit Fire was not arbitrary and capricious.

**RECOMMENDATION**

Based on the foregoing, it is recommended that Plaintiffs' motion for summary judgment (#58) be denied, Defendant's cross motion for summary judgment (#64) be granted, and Intervenor Defendants' cross motion for summary judgment (#67) be granted, and this case be dismissed.

*This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.* Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. *Objections to this Report and Recommendation, if any, are due on December 4, 2007. If objections are filed, any responses to the objections are due 14 days after the objections are filed.* Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.

DATED this _____20_____ day of November, 2007.


_____/s/_____
UNITED STATES MAGISTRATE JUDGE